SEALED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

FILED

2015 DEC 16  PM 3: 42

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY CLERK

| | |
|---|---|
| **UNITED STATES OF AMERICA,** § | **INDICTMENT** |
| § | |
| **Plaintiff,** § | [**COUNT 1:** Vio: 18 U.S.C. § 1962(d): RICO Conspiracy; |
| § | **COUNT 2:** Vio: 18 U.S.C. § 1959(a)(6): Violent Crimes in Aid of Racketeering – Conspiracy to Commit Assault with a Dangerous Weapon; |
| **v.** § | |
| § | |
| **JOHN XAVIER PORTILLO (1),** § | |
| **JEFFREY FAY PIKE (2),** § | **COUNTS 3-4:** Vio: 18 U.S.C. § 1959(a)(3) & 2: Aiding and Abetting Violent Crimes in Aid of Racketeering – Assault with a Dangerous Weapon; |
| **JUSTIN COLE FORSTER (3),** § | |
| § | |
| **Defendants,** § | |
| § | **COUNT 5:** Vio: 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A): Conspiracy to Possess with Intent to Distribute 500 grams or more of methamphetamine; |
| § | |
| § | |
| § | |
| § | **COUNT 6:** Vio: 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A): Possession with Intent to Distribute 500 grams or more of methamphetamine; |
| § | |
| § | |
| § | |
| § | **COUNTS 7-8:** Vio: 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C): Possession with Intent to Distribute methamphetamine; |
| § | |
| § | |
| § | **COUNT 9:** Vio: 18 U.S.C. § 1951: Interference with Commerce by Extortion] |

SA 15 CR 0820  DAE

1

THE GRAND JURY CHARGES:

## PART I – THE RACKETEERING CONSPIRACY
### COUNT ONE
### 18 U.S.C. § 1962(d) – RICO Conspiracy

### Background

At all times relevant to the Indictment:

    1.     The Bandidos Outlaw Motorcycle Organization (hereinafter referred to as the "Bandidos OMO") was an "outlaw" motorcycle organization comprised of individual chapters located in various cities in Texas, and elsewhere.

    2.     The Bandidos OMO is an international organization. The Bandidos OMO has approximately 175 or more chapters in fifteen countries on four continents, with approximately 107 chapters in the United States, including approximately 42 chapters in Texas. The Bandidos OMO membership is estimated at between 1,500 and 2,000 members. The National and International President, Jeffrey Fay Pike, resides in Conroe, Montgomery County, Texas. The National and International Vice President, John Xavier Portillo, resides in San Antonio, Bexar County, Texas.

    3.     The Bandidos OMO in the United States is a highly organized criminal organization which adheres to a hierarchical chain of command both nationally and locally. National officers are the most powerful and influential members of the enterprise. National officers comprise the National Chapter and include the President, Vice President, Secretary, Treasurer, and Sergeant at Arms. In addition to the National Chapter is a Nomad Chapter, which is located throughout the United States. The Nomad Chapter is involved in gathering intelligence for the Bandidos OMO and meeting with the National officers to provide information that relates to the enterprise. Local chapters are divided up according to geographic location. Each local chapter must have at least five members to exist and has to be approved by the National Chapter to be established. The enterprise is operated through a strict chain of command. Each Bandidos OMO Chapter has a President, a Vice-President, a Secretary and/or Treasurer, and a Sergeant at Arms, along with members. Each officer has specific obligations to

the enterprise and each is responsible for maintaining records and providing information or security for the chapter.

4.      The local Chapter Presidents report directly to the National Sergeant at Arms for the region or to other National officers in the region.  In San Antonio, local Chapter Presidents can report to the National Vice President, John Xavier Portillo.  If the local Chapter President reports to a National officer, that officer reports to the National Vice President.  The Nomad Chapter reports directly to the National Vice President as well. The National Vice President reports to the National President.

5.      The National Vice President serves as a point of contact for the other 1% motorcycle gangs to discuss territorial issues.  The National Vice President also approves or disapproves the existence of each support club, along with the patches worn by support clubs. Each local chapter President is responsible for support clubs that affiliate with the Bandidos OMO as well as the American Motorcycle Association clubs operating in the same geographical area. Some support clubs wear the reverse color scheme patch (yellow letters on a red background) to show their allegiance to the Bandidos OMO.  These support clubs are also referred to as "farm clubs" because this is the recruiting pool for the Bandidos OMO to pick individuals to prospect and become members of the Bandidos OMO.

6.      The President is the highest-ranking officer in each chapter.  Each President is responsible for holding regular chapter meetings, also known as "church".  Presidents are required to attend regularly-held national Presidents' meetings and also the mandatory Bandidos OMO "runs" (i.e., when members wear their "colors" and travel in groups on their motorcycles to a meeting location). The Sergeant at Arms of each chapter is in charge of security and enforcement activities related to the chapter.  The Secretary and/or Treasurer for the chapter is responsible for keeping current contact information for all their members as well as for all the other secretaries/treasurers so that information can be disseminated, maintaining the patches of retired Bandidos OMO members, maintaining records of bank accounts and club funds, collecting fines, collecting dues, and collecting "donations" from support clubs and paying the monies to the National Secretary.  Each Bandidos OMO member is required to attend meetings, runs, and pay chapter and national dues.  Each member is also required to pay a fine of up to $1,000 if a mandatory run is missed and is obligated to pledge their motorcycle and title to the enterprise.

7.      The Bandidos OMO is a closed society.  Allegiance to this organization and their fellow brothers is valued above all else.  Witnesses to their criminal acts are typically the victims of acts of intimidation or harassment and are too afraid to approach law enforcement or testify in court proceedings.  Bandidos OMO members do not fear authority and have a complete disdain for the rules of society.  The Bandidos OMO is very careful about admitting individuals into the enterprise.  There is a lengthy process before one can become a "full patch" member, as defined below.  This process is designed to guard against law enforcement infiltration into the enterprise.  First, the prospective member is allowed to associate with enterprise members.  After a period of time they are identified as a "hangaround" and obligated to do menial tasks for full club members.  The next phase is that the person becomes a "prospect" which requires being sponsored by a full patch member.  The club members then vote on whether the "prospect" can become a full patch member.

8.      Full patch members are required to own a Harley Davidson motorcycle or facsimile and wear clothing with patches that symbolize the club.  These patches are commonly known as club "colors."  The color scheme for the Bandidos OMO patch utilizes red letters on a gold (yellow) background.  The colors consist of an upper patch (top rocker patch) that identifies the Bandidos OMO name, a center patch which contains the emblem of the club, and a bottom patch (bottom rocker patch) which is representative of the State in which the members' chapter is located, or in the case of the National Officers, the United States patch or the title of their office.  Full patch members also wear a diamond-shaped "1%" patch.  The "1%" symbol is derived from an apocryphal statement that 99% of the country's motorcyclists are law-abiding individuals.  The "1%" symbol has become the symbol of the outlaw biker.  Members who wear their Bandidos OMO "colors" do so with the authority of the Bandidos OMO.  Members are required to wear their "colors" when riding their motorcycles and when attending a National Run or Bandidos OMO events.  When attending a National Run, and at other times, some Bandidos OMO members travel with Bandidos OMO merchandise to sell at the destination.  Only Bandidos OMO members and close associates with permission can sell Bandidos OMO merchandise, and a portion of the sales is funneled back to the enterprise.

9.      Bandidos OMO members, prospects, and members of support clubs are required to pay dues on a monthly basis. A portion of these dues are forwarded to the national leadership.  Support club dues are often referred to as "donations." Taxes are assessed on individual

members at various times, with the proceeds also being funneled up the Bandidos OMO chain to the national leadership. The dues and taxes help fund the continued operation of the enterprise and are used for a variety of purposes, including the payment of expenses to the national leadership, covering funeral expenses of members, contributing to a legal defense fund for members, and paying costs associated with planned trips or "runs." The enterprise also raises funds for its activities and legal defense through unlawful gambling activities, namely raffles.

### The Enterprise

10.     At all times relevant and material to this Indictment, in the Western District of Texas and elsewhere, the "Bandidos Outlaw Motorcycle Organization," including its leadership, members and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

### Purpose of the Enterprise

11.     The objectives and purposes of the Bandidos OMO enterprise included the following:

    a.     Preserving, protecting and enhancing the power, territory, reputation and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, murder, attempted murder and robbery against rival motorcycle organizations;

    b.     Promoting and enhancing the enterprise and its members' and associates' activities, including, but not limited to, robberies, including robbery of property of rival motorcycle organizations, and other criminal activities;

    c.     Making money for the enterprise through, among other things, extorting money from other motorcycle organizations through fear and threats of violence, drug trafficking, and illegal gambling activities;

    d.     Maximizing profits for enterprise leaders and members from a variety of illegal activity;

    e.    Keeping victims, potential victims, potential informants and witnesses, and the public-at-large in fear of the enterprise, and in fear of its members and associates, through extortion, intimidation, violence and threats of violence.

## Manner and Means of the Enterprise

12.    The manner and means used by the enterprise to further the goals of the enterprise and achieve its purposes, included, but was not limited to, the following:

    a.    The leaders of the enterprise directed, sanctioned, approved and permitted other members of the enterprise to carry out acts in furtherance of the enterprise.

    b.    Members of the enterprise and their associates committed, conspired to commit, and threatened to commit acts of violence, including murder, attempted murder, assault, intimidation and extortion to protect the enterprise's power, territory and property.

    c.    Members of the enterprise and their associates promoted a climate of fear through intimidation, violence, and threats of violence.

    d.    Members of the enterprise and their associates used and threatened to use physical violence against various individuals, including rival motorcycle organization members.

    e.    Members of the enterprise and their associates committed, and conspired to commit, extortion and robberies, including robbery of property of rival motorcycle organizations and stealing items of value, the proceeds of which were used to benefit the enterprise and its members;

    f.    Members of the enterprise and their associates were financially enriched through extortion and illegal gambling activities, namely raffles.

    g.    Members of the enterprise and their associates were financially enriched through the distribution of controlled substances, namely methamphetamine.

    h.    Members of the enterprise and their associates extorted other motorcycle organizations to pay money to the Bandidos OMO, upon fear and threat of violence;

    i.    Members of the enterprise and their associates traveled in interstate commerce, and used facilities in interstate commerce, to further the goals of the enterprise and achieve its purposes, including acts of violence and extortion.

j.      Members of the enterprise talked in code when communicating over the telephone to avoid law enforcement detection, and communication in person was always preferable.

k.      Members of the enterprise and their associates were forbidden from cooperating with law enforcement.  Attorney's fees were paid for by the enterprise when members were arrested for club-related business and to ensure silence was maintained.  Legal paperwork was reviewed for signs of cooperation.

## Roles of Defendants

13.     In addition to being members of the enterprise, the defendants served in various roles within the enterprise, including the following:

a.      JOHN XAVIER PORTILLO was the National Vice President for the Bandidos OMO. During a period of the conspiracy, from approximately May 2015 until August 26, 2015, Portillo served as the acting National President of the Bandidos OMO while Jeffrey Pike recovered from surgery.  When Pike was healthy enough to ride a motorcycle again, Pike reassumed the Presidency and Portillo returned to Vice President.  In his role as the National Vice President of the Bandidos OMO, and during his tenure as the acting National President, Portillo had ultimate decision-making authority for the activities of the Bandidos OMO.  While each individual chapter has a president, Portillo is apprised of and involved in significant decisions that affect the enterprise and its goals, particularly its criminal activities.  These decisions include directing, sanctioning, approving, and permitting other members to negotiate with members of competing motorcycle clubs to protect the interests of the Bandidos OMO, to discourage and prevent prospective witnesses from providing information to law enforcement about the Bandidos OMO, and directing, sanctioning, approving and permitting other members to engage in criminal activities including murder and assault related to the protection of the power and territory of the enterprise.  Portillo is responsible for apprising National President Jeffrey Pike of the activities of the Bandidos OMO, but Portillo retains much of the day-to-day decision-making authority.

b.      JEFFREY FAY PIKE was the National President of the Bandidos OMO. During a period of the conspiracy, from approximately May 2015 until August 26, 2015, John Portillo served as the acting National President of the Bandidos while Pike recovered from

surgery. When Pike was healthy enough to ride a motorcycle again, Pike reassumed the Presidency and Portillo returned to Vice President. In his role as National President, Pike has ultimate decision-making authority for the activities of the Bandidos OMO. Pike is briefed directly by Portillo, who deals with more day-to-day decisions. Pike is involved in significant decisions that affect the Enterprise and its goals, particularly its criminal activities. These decisions include sanctioning, approving and permitting other members to engage in criminal activities including murder and assault related to the protection of the power and territory of the enterprise.

        c.    JUSTIN COLE FORSTER was a National Sergeant at Arms of the Bandidos OMO. Forster reports directly to Portillo and is one of Portillo's most trusted associates in the enterprise. Forster is allowed to exert significant decision-making power and control over the activities of Bandidos OMO members in the Texas area. He is responsible for the enforcement of club rules, carrying out disciplinary actions against club members who violate club rules, extortion of members who leave the club, and carrying out directives from Portillo. By virtue of his position within the club, Forster is allowed to engage in distribution of controlled substances and extortion of support club members for his personal benefit.

### The Racketeering Conspiracy

      14.    Beginning on a date unknown, but starting no later than the year 2012, and continuing to the date of this Indictment, in the Western District of Texas and elsewhere, defendants

JOHN XAVIER PORTILLO,

JEFFREY FAY PIKE, and

JUSTIN COLE FORSTER

and other persons not named in this Indictment, being persons employed by and associated with the Bandidos OMO, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with one another to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of said

enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) through (5), consisting of:

    (1) Multiple acts involving:

        a.   Murder, in violation of Texas Penal Code Sections 7.01, 7.02, 15.02 and 19.02;

        b.   Robbery, in violation of Texas Penal Code Sections 7.01, 7.02, 15.02 and 29.02; and

    (2) Multiple acts indictable under the following provisions of federal law:

        a.   Title 18, United States Code, Section 1951 (relating to interference with commerce by extortion);

        b.   Title 18, United States Code, Section 1952 (interstate travel in aid of racketeering); and

    (3) Multiple offenses involving trafficking in controlled substances, in violation of Title 21, United States Code, Sections 841, 843(b) and 846.

## Overt Acts

In furtherance of the conspiracy, and to affect the object and purposes thereof, the defendants, and others known and unknown to the grand jury, committed various overt acts, including but not limited to the following:

### *War with Cossacks Outlaw Motorcycle Organization*

    (1)  Beginning at a time unknown, but during 2013 and continuing through the date of this Indictment, John Xavier Portillo, acting in his capacity as National Vice President of the Bandidos OMO, declared that the Bandidos OMO was "at war" with the Cossacks Outlaw Motorcycle Organization (hereinafter "Cossacks OMO").

    (2)  On November 2, 2013, a group of approximately 10 Bandidos OMO members and their associates confronted members of the Cossacks OMO in Abilene, Texas.  After taking the whips off of the parked motorcycles owned by Cossacks OMO members, Bandidos OMO members and associates began assaulting Cossacks OMO members, including stabbing some Cossacks OMO members with knives, resulting in serious injuries to Cossacks OMO members T.S., E.C., J.W., and T.B.

(3)  On or about November 2, 2013, after concluding the assault on Cossacks OMO members in Abilene, Texas, the Bandidos OMO Abilene, Texas Chapter President threatened Cossacks OMO members by stating, "This is our town. If you come back I will kill you," in furtherance of John Portillo's declaration of war against the Cossacks OMO and the protection of Bandidos OMO territory.

(4)  On or about August 8, 2014, Bandidos OMO Nomad Chapter members were dispatched to the Fort Worth, Texas area to conduct surveillance on Cossacks OMO members in the area. Photos of Cossack OMO members were taken to help Bandidos OMO member properly identify them.

(5)  On a date unknown, but prior to December 12, 2014, John Portillo again informed Dallas-area Bandidos OMO members that they were "at war" with the Cossacks OMO.

(6)  On or about December 11, 2014, Bandidos OMO members entered Red's Take 5 Sports Bar, a known Cossacks OMO hangout in Wise County, Texas looking for Cossacks OMO members.  When no Cossacks OMO members were present as expected, Bandidos OMO members left the bar, posting a "Bandidos" sticker on the bar door.

(7)  On or about December 12, 2014, Bandidos OMO members entered the Gators Jam Inn in Fort Worth, Texas, where members of the Cossacks OMO, Ghost Riders OMO and Winos OMO were conducting a meeting.  Bandidos OMO members immediately began assaulting the OMO members present and Ghost Riders OMO member G.B. was shot and killed.

(8)  On a date unknown, but prior to March 3, 2015, John Portillo asked Jeffrey Pike to "turn his back from what I'm gonna do," in an attempt to shield Pike from criminal responsibility when referencing his intended orders regarding the war with the Cossacks OMO.

(9)  On March 3, 2015, John Portillo again declared that the Bandidos OMO was "at war" with the Cossacks OMO.  Portillo indicated he "wants that Texas rocker back," referencing the "Texas" bottom rocker worn by Cossacks OMO members without Bandidos OMO permission.

(10)  On or about March 3, 2015, John Portillo ordered Bandidos OMO members and support club members to travel armed to Odessa, Texas to confront members of the Cossacks OMO.

(11)  On or about March 20-21, 2015, Bandidos OMO members from all over Texas, including John Portillo and members from San Angelo, Texas and Amarillo, Texas, traveled to the Tyler, Texas area for a "birthday run," a celebration of an anniversary of a Bandidos OMO Chapter in Tyler, Texas.

(12)  On or about March 21, 2015, John Portillo ordered four Bandidos OMO members to "shak[e] up shit" and "get a little aggressive" with some of the Cossacks OMO members in the West Texas area.

(13)  On March 22, 2015, approximately 20 Bandidos OMO members and associates confronted Cossacks OMO member A.Y. at a gas station in West Texas, near Gordon in Palo Pinto County, in furtherance of John Portillo's orders to stir things up.  The Bandidos OMO members demanded A.Y. give them his vest displaying a "Texas" bottom rocker.  After A.Y. refused, the Bandidos OMO members and associates assaulted A.Y., including striking A.Y. in the head multiple times with a claw hammer, causing serious injury.  A.Y.'s vest was then forcibly removed from his body and taken, along with his telephone.  The Bandidos OMO members and associates were returning from the Tyler, Texas "birthday run."

(14)  On or about April 11, 2015, Bandidos OMO members and support club members from around the State of Texas, New Mexico, and elsewhere, traveled to Odessa, Texas while armed to confront members of the Cossacks OMO, at the direction of John Portillo.

(15)  On April 11, 2015, three Bandidos OMO New Mexico Chapter members were stopped in Odessa, Texas and found in possession of 10 firearms and assorted ammunition that they brought with them from New Mexico to confront members of the Cossacks OMO.  The firearms included:

- a Glock 27, .40 caliber pistol, serial number GRB572;
- a Ruger LCP, 380 caliber pistol, serial number 377-05148;
- a Canik 55 TP9, 9mm pistol, serial number T6472-12 AI02991, found inside a holster displaying a "1%er" sticker containing red letters on a gold background in a diamond shape;
- a Hi-Point C9, 9mm pistol, serial number P1391745;
- a Taurus Millennium PT140, .40 caliber handgun, serial number SVI74732;
- a Jimenez Arms J.A. 22, .22 caliber handgun, serial number 1131128, found inside a pocket of a biker vest displaying "Bandidos";
- a Cobra CB9, 9mm pistol, serial number CT124065, found inside a pocket of a second biker vest displaying "Bandidos";
- a Ruger P95, 9mm pistol, serial number 316-50796, found inside a travel bag with "Bandidos" displayed on it;
- a Full Metal Jacket, 45/410 caliber handgun, serial number A0049822;
- a Mossberg 12 gauge shot gun with wood stock, serial number L241479;

- miscellaneous ammunition and 10 miscellaneous handgun magazines

(16)  On or about May 23, 2015, John Portillo raised Bandidos OMO dues and support club "donations" to prepare to pay for bonds and legal expenses for Bandidos OMO members that would go to jail for "club business," including criminal acts committed against members of the Cossacks OMO.  Bandidos OMO members were required to pay $100 per month rather than $50, and support club members were required to pay $50 per month rather than $25.

(17)  On or about June 18, 2015, John Portillo made the La Familia Outlaw Motorcycle Organization in Odessa, Texas an official Bandidos OMO support club because of the presence of Cossacks OMO members in that area.

(18)  On July 22, 2015, John Portillo was informed by a Bandidos OMO member that Cossacks OMO member C.M. had moved into Bandidos OMO territory in Buda, Texas. Portillo responded by asking, "Are they that stupid?" and then stated, "They'll know what will happen."

(19)  On July 28, 2015, John Portillo discussed taking action against Cossacks OMO member C.M. in Buda, Texas but cautioned it might not be possible.  Portillo stated that he "need[s] it done" when referencing harming the Cossacks OMO member, but cautioned, "Look, I don't want that guy out there in Buda no more than anybody else... I just don't think we can pull it off without getting caught."

(20)  On July 28, 2015, John Portillo again declared that the Bandidos OMO was "at war" with the Cossacks OMO.  Portillo stated "this is really an all-out war we got going on."

(21)  On August 22, 2015, a prospect for the Mestizoz OMO, a Bandidos OMO support club, reported the presence of Cossack OMO members in Port Aransas, Texas so that local Bandidos OMO members could be informed.

(22)  On August 22, 2015, Bandidos OMO members assaulted Cossacks OMO members and associates in Port Aransas, Texas by kicking and hitting them. Cossacks OMO member R.K. was hit in the head with a beer bottle.

(23)  On August 23, 2015, the Bandidos OMO Corpus Christi Chapter Sergeant at Arms called John Portillo to report the assault in Port Aransas.  The assault was discussed in a coded conversation; alternate phone numbers were then exchanged so the conversation could continue without the necessity of full code.  The assault was referred to as a "fishing trip;" according to the Corpus Christi Chapter Sergeant at Arms, "everyone got to catch a fish." Portillo was happy with the assault.

(24)  On or about August 23, 2015, the Mestizoz OMO prospect who reported the presence of Cossacks OMO members in the Port Aransas, Texas area was promoted to full "patched" member for his actions in reporting the presence of Cossacks OMO members in the area and assisting in assaulting the Cossacks OMO members.

(25)  On or about August 24, 2015, John Portillo, Justin Forster, and other Bandidos OMO members met at Chuy's Bar in Natalia, Texas, a bar owned by the Bandidos OMO Hill County Chapter President, to discuss the presence of Cossacks OMO members in Carrizo Springs and Crystal City, Texas and how to respond.

(26)  On or about August 24, 2015, John Portillo ordered Bandidos OMO members to confront and assault members of the Cossacks OMO in Crystal City, Texas over Labor Day Weekend.

(27)  On August 26, 2015, John Portillo traveled to Houston, Texas to meet with Bandidos OMO National President Jeffrey Pike to discuss, among other things, the upcoming plans to assault Cossacks OMO members.

(28)  On August 26, 2015, John Portillo placed a telephone call to Justin Forster to inform him that Jeffrey Pike authorized and approved the plan to assault Cossacks OMO members in Crystal City, Texas.  John Portillo relayed that Pike said, "Play Ball!" and "Batter up motherfucker!"  Forster responded that Forster "may not have a full roster, but we'll be good, you know what I mean?"

(29)  On or about August 27, 2015, Justin Forster recruited other Bandidos OMO members to accompany him to Crystal City, Texas to confront and assault Cossacks OMO members.

(30)  On or about September 3, 2015, John Portillo possessed a firearm, namely a .38 snub nose revolver, when driving through Abilene, Texas in preparation for potentially encountering Cossacks OMO members.

(31)  On or about September 4-5, 2015, Bandidos OMO members, including Justin Forster, traveled to Crystal City, Texas and the surrounding South Texas area to look for Cossacks OMO members, to satisfy John Portillo and Jeffrey Pike's orders to assault Cossacks OMO members.

(32)  On September 17, 2015, Jeffrey Pike placed a telephone call to John Portillo and instructed Portillo to get a copy of the accident report related to when a Bandidos OMO member was assaulted by Cossacks OMO members on the side of the roadway in Lorena, Texas on March 22, 2015, so that Pike could attempt to identify the individuals involved in the assault.

(33)  On September 17, 2015, John Portillo instructed the Bandidos OMO member who was assaulted on March 22, 2015 to follow-up on getting a copy of the police report from the incident, in furtherance of Jeffrey Pike's order.

### Other Acts

(34)  Beginning on a date unknown, but starting no later than 2012 and continuing to the date of this Indictment, Bandidos OMO members were required to pay monthly dues or face violence or club expulsion.  These monies were used to further the activities of the Bandidos OMO.

(35)  Beginning on a date unknown, but starting no later than 2012 and continuing to the date of this Indictment, Bandidos OMO members collected monetary "donations" from support club members on a monthly basis with implicit threats of force and expulsion.  These monies were used to further the activities of the Bandidos OMO.

(36)  On or about August 6, 2014, in the Western District of Texas, John Portillo received approximately ten pounds of methamphetamine, which was transported to Texas from Colorado by Bandidos OMO members.

(37)  On or about August 6, 2014, in the Western District of Texas, John Portillo made a payment of $10,000 to a Colorado Bandidos OMO member in exchange for the delivery of methamphetamine.

(38)  On or about September 15, 2014, Colorado Bandidos OMO members delivered a shipment of crystal methamphetamine to San Antonio area Bandidos OMO members.

(39)  On or about November 2, 2014, in the District of Colorado, the Bandidos OMO Colorado Westside Denver Chapter President possessed approximately two pounds of crystal methamphetamine with the intent to deliver the methamphetamine to San Antonio-area Bandidos OMO members.

(40)  On November 3, 2014, a Bandidos OMO National Sergeant at Arms attempted to mail four firearms from Colorado to himself in Las Vegas, Nevada.

(41)  On or about November 6, 2014, Bandidos OMO members from the states of Texas, New Mexico and Colorado traveled to Las Vegas, Nevada to serve as protection for John Portillo, at the direction of John Portillo.  Many of the Bandidos OMO members transported firearms with them.

(42)  On January 16, 2015, in the Western District of Texas, a Bandidos OMO National Sergeant at Arms possessed methamphetamine and a firearm, to-wit: a Springfield Armory, 9mm pistol, serial number MG768423.  The National Sergeant at Arms, who was in the company of other Bandidos OMO members, was fleeing Colorado, where he was wanted on an outstanding warrant, and attempting to get to Costa Rica.

(43)  On or about May 21, 2015, in the Western District of Texas, Justin Forster provided approximately two ounces of crystal methamphetamine to another individual, with agreement that payment of $1,600 be made later.  Forster wore his Bandidos OMO "colors" during the transaction.

(44)  On or about May 21, 2015, in the Western District of Texas, Justin Forster received payment of $700 for methamphetamine Forster previously provided.

(45)  On or about May 26, 2015, in the Western District of Texas, Justin Forster provided approximately one ounce of crystal methamphetamine to another individual, with agreement that payment of $1,000 be made later.

(46)  On May 27, 2015, in the Western District of Texas, Justin Forster received payment of $1,000 for methamphetamine Forster previously provided.

(47)  On or about May 28, 2015, in the Western District of Texas, Justin Forster provided approximately one ounce of crystal methamphetamine to another individual, with agreement that payment of $800 be made later.

(48)  On or about June 1, 2015, John Portillo authorized Justin Forster and other Bandidos OMO members to use violence to collect $3,500 from a San Antonio area Bandidos OMO Chapter.

(49)  On or about June 1, 2015, in the Western District of Texas, Justin Forster provided approximately one-half ounce of crystal methamphetamine to another individual, with agreement that payment of $400 be made later.

(50)  On or about June 2, 2015, in the Western District of Texas, Justin Forster received payment of $800 for methamphetamine Forster previously provided.

(51)  On or about June 7, 2015, in the Western District of Texas, Justin Forster provided approximately one ounce of crystal methamphetamine to another individual, with agreement that payment of $800 be made later.

(52)  On or about June 9, 2015, in the Western District of Texas, Justin Forster received payment of $800 for methamphetamine Forster previously provided.

(53)  On or about June 10, 2015, Justin Forster proposed to John Portillo that they fine a Bandidos OMO member $500 for not traveling to Gulfport, Mississippi.  Portillo authorized the $500 fine.

(54)  On or about June 30, 2015, in the Western District of Texas, Justin Forster provided approximately one ounce of crystal methamphetamine to another individual in exchange for $800.

(55)  On or about July 10, 2015, New Mexico Bandidos OMO members stopped and confronted a member of the Henchman Outlaw Motorcycle Organization who was riding through New Mexico on his motorcycle without having called ahead and received permission from the Bandidos OMO.  The Bandidos OMO members stopped the Henchman OMO member and took his vest. This encounter was then reported to John Portillo.

(56)  On or about September 1, 2015, with the permission of John Portillo, a Bandidos OMO member seized $300 and all the property that included Bandidos OMO identifying symbols from a Bandidos OMO retiring member, with implicit threats and the explicit threat of additional monies owed if the retiring member did not turn over everything and make payment.  Portillo permitted the member who seized the items to keep the $300 for his own personal benefit.

(57)  On or about September 5-6, 2015, Bandidos OMO members were required to travel on their motorcycles to South Dakota as part of a mandatory "run."  Those Bandidos OMO members that did not attend the "run" were fined $1,000.  Bandidos OMO members that showed up in a vehicle, rather than on motorcycles, were required by Jeffrey Pike to do guard duty from Friday night until Sunday rather than participate in Bandidos OMO activities.

(58)  On or about September 18, 2015, a Bandidos OMO member seized a "Nomad" rocker off of a Bandoleros OMO member in Bandera, Texas, at the direction of John Portillo, with implicit threats of force.

(59)  On or about October 22, 2015, at the direction of John Portillo, Bandidos OMO members traveled to California to conduct a sit-down meeting with members of the Hell's Angels Outlaw Motorcycle Organization.  Bandidos OMO funds paid for the flight and expenses.

(60) On or about October 22, 2015, John Portillo acted as a "referee" in a dispute Justin Forster and a Bandidos OMO prospect had with another individual over a drug debt.

(61) On or about October 26, 2015, John Portillo authorized the use of violence by the Infidels OMO, a Bandidos OMO support club, against the Sons of Silence OMO in Mississippi over a territory dispute and disrespect shown to the Bandidos OMO.

(62) On or about November 3-7, 2015, John Portillo traveled to Las Vegas, Nevada to conduct a sit-down meeting with the National President of the Vagos Outlaw Motorcycle Organization.

(63) On or about November 3-7, 2015, Bandidos OMO members from Texas and New Mexico traveled to Las Vegas, Nevada with John Portillo to serve as protection for John Portillo. Some of the Bandidos OMO members traveled with firearms.

All in violation of Title 18, United States Code, Section 1962(d).

## PART II – VIOLENT CRIMES IN AID OF RACKETEERING
### COUNT TWO
### 18 U.S.C. §§ 1959(a)(6); Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering

1. At all times relevant to this Indictment, the "Bandidos Outlaw Motorcycle Organization," as more fully described in Paragraphs 1 through 13 of Count One of this Indictment, which are realleged and incorporated by reference as though set forth fully herein, including its leadership, members and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2. At all times relevant to this Indictment, the above-described enterprise, the Bandidos OMO, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely,

(1) Multiple acts involving:

    a.  Murder, in violation of Texas Penal Code Sections 7.01, 7.02, 15.02 and 19.02;

      b.  Robbery, in violation of Texas Penal Code Sections 7.01, 7.02, 15.02 and 29.02;
and

(2) Multiple acts indictable under the following provisions of federal law:

      a.  Title 18, United States Code, Section 1951 (relating to interference with
commerce by extortion);

      b.  Title 18, United States Code, Section 1952 (interstate travel in aid of
racketeering); and

(3) Multiple offenses involving trafficking in controlled substances, in violation of Title 21,
United States Code, Sections 841, 843(b) and 846.

3.  Beginning at a time unknown but during 2013 and continuing through the date of this
indictment, in the Western District of Texas, and elsewhere, defendants JOHN XAVIER
PORTILLO, JEFFREY FAY PIKE, JUSTIN COLE FORSTER, and others, known and
unknown to the grand jury, did, for the purpose of maintaining and increasing position in the
Bandidos OMO, an enterprise engaged in racketeering activity, knowingly and unlawfully
conspire to assault members and associates of the Cossacks OMO, and anyone who was with
them, with a dangerous weapon, in violation of Texas Penal Code, Sections 15.02 and
22.02(a)(2).

      All in violation of Title 18, United States Code, Sections 1959(a)(6).

### COUNT THREE

### 18 U.S.C. §§ 1959(a)(3); Assault with a Dangerous Weapon in Aid of Racketeering
### Palo Pinto County, Texas

1.  Paragraphs One-Two of Count Two are re-alleged herein as if fully incorporated in this
Count.

2.  On or about March 22, 2015, in the Western District of Texas, and elsewhere, in or around
Gordon, Palo Pinto County, Texas, defendant JOHN PORTILLO, and others known and
unknown to the grand jury, for the purpose of maintaining and increasing position in the
Bandidos OMO, an enterprise engaged in racketeering activity, did aid and abet each other in
knowingly and unlawfully assaulting A.Y. with a dangerous weapon, in violation of Texas Penal
Code, Sections 7.01, 7.02 and 22.02(a)(2).

      All in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

## COUNT FOUR

### *18 U.S.C. § 1959(a)(3); Assault with a Dangerous Weapon in Aid of Racketeering*

### Port Aransas, Texas

1. Paragraphs One-Two of Count Two are re-alleged herein as if fully incorporated in this Count.

2. On or about August 22, 2015, in the Western District of Texas, and elsewhere, in or around Port Aransas, Texas, defendant JOHN PORTILLO, and others known and unknown to the grand jury, for the purpose of maintaining and increasing position in the Bandidos OMO, an enterprise engaged in racketeering activity, did aid and abet each other in knowingly and unlawfully assaulting R.K. with a dangerous weapon, in violation of Texas Penal Code, Sections 7.01, 7.02 and 22.02(a)(2).

All in violation of Title 18, United States Code, Sections 1959(a)(3) and 2.

## PART III – DRUG TRAFFICKING OFFENSES

## COUNT FIVE

### 21 U.S.C. §§§ 846, 841(a)(1) & 841(b)(1)(A) – Conspiracy to Distribute and Possession with Intent to Distribute 500 grams or more of methamphetamine

1. That beginning on or about January 1, 2013, the exact date unknown to the Grand Jury, and continuing until the date of this Indictment, in the Western District of Texas, Defendants, JOHN PORTILLO and JUSTIN FORSTER, knowingly, intentionally, and unlawfully conspired, combined, confederated, and agreed with others known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 21, United States Code, Section 846, that is to say, he conspired to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II Controlled Substance, in violation of Title 21, United States Code Sections 846, 841(a)(1) and 841(b)(1)(A).

## COUNT SIX

### 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A) – Possession with Intent to Distribute 500 grams or more of methamphetamine

1.  That on or about August 6, 2014, in the Western District of Texas, Defendant, JOHN PORTILLO, did knowingly, intentionally and unlawfully attempt to possess with the intent to distribute a controlled substance, which offense involved 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A).

## COUNT SEVEN
### 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) – Possession with Intent to Distribute methamphetamine

1.  That on or about May 21, 2015, in the Western District of Texas, Defendant, JUSTIN FORSTER, did knowingly, intentionally and unlawfully possess with the intent to distribute a controlled substance, which offense involved a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C).

## COUNT EIGHT
### 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) – Possession with Intent to Distribute methamphetamine

1.  That on or about June 30, 2015, in the Western District of Texas, Defendant, JUSTIN FORSTER, did knowingly, intentionally and unlawfully possess with the intent to distribute, a controlled substance which offense involved a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C).

## PART IV –EXTORTION
## COUNT NINE
### 18 U.S.C. §§ 1951; Conspiracy to Interfere with Commerce by Extortion

1.  Beginning in 2013, the exact date unknown to the Grand Jury, and continuing to the date of this Indictment, in the Western, Eastern, Northern and Southern Districts of Texas, and other parts of the United States, defendant JOHN XAVIER PORTILLO, JEFFREY FAY PIKE,

JUSTIN COLE FORSTER, and others known and unknown, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together with others known and unknown, in any way or degree, to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), in violation of 18 U.S.C. § 1951.

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
### [*See* Fed. R. Crim. P. 32.2]
### I.
### Forfeiture Statutes for RICO Conspiracy
### [Title 18 U.S.C. § 1962(d), subject to forfeiture pursuant to Title 18 U.S.C. §§ 1963(a)(1)-(3) and Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461]

As a result of the foregoing criminal violations set forth in Count One, the United States of America gives notice to Defendants JOHN XAVIER PORTILLO, JEFFREY FAY PIKE, and JUSTIN COLE FORSTER, of its intent to seek the forfeiture of the below described properties upon conviction and pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. §§ 1963(a)(1)-(3), and Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461 which state:

**Title 18 USC § 1963. Criminal Penalties**
**(a)** Whoever violates any provision of section 1962 of this chapter shall … forfeit to the United States, irrespective of any provision of State law-
  **(1)** any interest the person has acquired or maintained in violation of section 1962;
  **(2)** any-
      **(A)** interest in;
      **(B)** security of;
      **(C)** claim against; or
      **(D)** property or contractual right of any kind affording a source of influence over;
    any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

**(3)** any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

**(b)** Property subject to criminal forfeiture under this section includes-

**(1)** real property, including things growing on, affixed to, and found in land; and

**(2)** tangible and intangible personal property, including rights, privileges, interests, claims, and securities.

## II.

### Forfeiture Statutes for Drug Violations
### [Title 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and (b)(1)(C)
### subject to forfeiture pursuant to Title 21 U.S.C. §§ 853 (a)(1) and (2)]

As a result of the foregoing criminal violations set forth in Counts Twelve through Fifteen, the United States of America gives notice to Defendants JOHN XAVIER PORTILLO and JUSTIN COLE FORSTER, of its intent to seek the forfeiture of the below described properties upon conviction and pursuant to Fed. R. Crim. P. 32.2 and Title 21 USC §§ 853(a)(1) and (2), which state:

**Title 21 USC § 853. Criminal forfeitures**

**(a)** Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law –

**(1)** any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

**(2)** any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; . . .

## III.

### Forfeiture Statutes for Extortion
### [Title 18 U.S.C. § 1951, subject to forfeiture pursuant to Title 18 U.S.C. §§ 981(a)(1)(C) and
### Title 18 U.S.C. § 924(d)(1), both made applicable to criminal forfeiture
### by Title 28 U.S.C. § 2461]

As a result of the foregoing criminal violations set forth in Count Sixteen, the United States of America gives notice to Defendants JOHN XAVIER PORTILLO, JEFFREY FAY PIKE, and JUSTIN COLE FORSTER, of its intent to seek the forfeiture of the below described properties upon conviction and pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(c) and Title 18 U.S.C. § 924(d)(1), both made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which state:

**Title 18 U.S.C. § 981.**
**(a)(1)** The following property is subject to forfeiture to the United States:
    **(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

**Title 18 USC § 924. Penalties**
    **(d)(1)** Any firearm or ammunition involved in or used in any . . . violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture . . . under the provisions of this chapter . . . .
      **(3)** The offenses referred to in paragraphs (1) and 2(C), of this subsection are-
        **(A)** any crime of violence, as that term is defined in section 924(c)(3) of this title; . . .

A TRUE BILL



_____
FOREPERSON OF THE GRAND JURY

RICHARD L. DURBIN, JR.
UNITED STATES ATTORNEY

BY: _____
ERIC J. FUCHS
Assistant United States Attorney